TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-04-00715-CV




David McDonald, Appellant

v.

Diana Dankworth, Appellee





FROM THE COUNTY COURT OF LAW NO. 1 OF WILLIAMSON COUNTY
NO. 03-0372-CC1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING




O P I N I O N


                        While driving, appellee Diana Dankworth rear-ended another motorist, appellant
David McDonald. She conceded that her own negligence contributed to the collision, but contended
that McDonald was also responsible because he made an “unexpected” or “sudden” stop in front of
her. A jury found that both Dankworth and McDonald’s negligence proximately caused the
occurrence, allocated 50% of the responsibility to each, and found that McDonald had incurred, as
a result of the occurrence, $4,549.57 in past medical expenses, $1,497.54 in lost wages, and zero
damages for physical impairment and physical pain and mental anguish. The trial court rendered
judgment on the verdict, awarding McDonald $3,023.55, 50% of the damages the jury had found. 
See Tex. Civ. Prac. & Rem. Code Ann. § 33.012(a) (West Supp. 2005).
                        McDonald argues that (1) there is legally or factually insufficient evidence to support
the jury’s findings that his negligence was a proximate cause of the collision; (2) the evidence
conclusively establishes that McDonald incurred $31,348.87 in medical expenses as a result of the
collision, or, alternatively, that the jury’s award of only $4,549.57 in past medical expenses is against
the great weight and preponderance of the evidence; and (3) the jury’s awards of zero damages for
physical pain and mental anguish and physical impairment are against the great weight and
preponderance of the evidence. We will affirm the trial court’s judgment. 

DISCUSSION
                        We will detail the evidence concerning the collision and damages as we evaluate
McDonald’s sufficiency challenges.

Standard of review
                        We will sustain a legal sufficiency point if the record reveals: (a) the complete
absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no
more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, “No
Evidence” & “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). The
ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. See id. at 827.
                        When the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal
effect, is no evidence. See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (citing
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). But more than a scintilla of evidence
exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ
in their conclusions. Id. (citing Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997)). We review the evidence in the light favorable to the verdict, crediting favorable evidence
if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. See
City of Keller, 168 S.W.3d at 807.
                        We emphasize that jurors are the sole judges of the credibility of the witnesses and
the weight to give their testimony. Id. at 819. When there is conflicting evidence, it is the province
of the jury to resolve such conflicts. Id. at 820. If conflicting inferences can be drawn from the
evidence, we assume jurors made all inferences in favor of their verdict if reasonable minds could,
and disregard all other inferences. Id. at 821. But if the evidence allows only one inference, we may
not disregard it. See id. As long as the evidence falls within a zone of reasonable disagreement, we
may not substitute our judgment for that of the trier-of-fact. See id. at 822.
                        When reviewing a challenge to the factual sufficiency of the evidence supporting a
finding, we must consider, weigh, and examine all of the evidence in the record, both supporting and
against the finding, to decide whether the verdict should be set aside. Plas-Tex, Inc. v. U.S. Steel
Corp., 772 S.W.2d 442, 445 (Tex. 1989); Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.
1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak
as to be clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).
But we may not merely substitute our judgment for that of the jury. Pool, 715 S.W.2d at 635. The
jury remains the sole judge of witnesses’ credibility and the weight to be given their testimony. 
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).
                        The starting point for our analysis of both types of evidentiary sufficiency challenges
is the charge as submitted to the jury. Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (legal
sufficiency); Jackson, 116 S.W.3d at 762 (factual sufficiency); Ancira Enters., Inc. v. Fischer, 178
S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.). 

Negligence findings against McDonald
                        In Question No. 1, the jury was asked, as to both Dankworth and McDonald, whether
that person’s negligence,


 if any, proximately caused


 “the occurrence in question.” Predicated on
a finding that both Dankworth and McDonald’s negligence had proximately caused the “occurrence,”
Question 2 asked the jury to allocate the percentage of the total (100%) negligence causing the
occurrence that it found to be attributable to Dankworth versus McDonald. McDonald contends that
there is legally or factually insufficient evidence to support the jury’s findings that he was negligent
and that Dankworth was not 100% responsible for the occurrence. 
                        We note that under Texas law, as was reflected in the charge, “[t]he standards and
tests for determining contributory negligence ordinarily are the same as those for determining
negligence,” and when contributory negligence is submitted, “the burden of proof is on the defendant
to prove the defense by a preponderance of the evidence.” Carney v. Roberts Inv. Co., 837 S.W.2d
206, 208 (Tex. App.—Tyler 1992, writ denied).
                        As a threshold matter, the parties dispute whether the “occurrence in question”
referenced in Questions 1 and 2 includes only the collision, as McDonald contends, or extends to the
“occurrence” of McDonald’s ultimate injuries, as Dankworth urges. This determination, in turn,
would control the scope of evidence we may consider as potential support for the jury’s finding that
McDonald was negligent. McDonald argues that “occurrence in question” referred only to the
collision, not his ultimate injuries, and that we may accordingly consider only McDonald’s pre-accident conduct in our sufficiency analysis here. Dankworth responds that the charge did not define
“occurrence in question,” thereby enabling the jury to consider both McDonald’s pre-accident
conduct and any post-accident conduct that the jury found had contributed to his ultimate injuries. 
Each party attempts to characterize the other’s argument as a waived complaint of charge error:
McDonald suggests that Dankworth waived her complaint by agreeing to submit Question 1 with
the phrase “occurrence in question” rather than “injury,”


 while Dankworth argues that McDonald
waived his contention by failing to request a definition or instruction clarifying and limiting 
“occurrence in question” to the accident.
                        We need not resolve this threshold question because we conclude that evidence of
McDonald’s pre-collision negligence alone is sufficient to support the jury’s finding that
McDonald’s negligence was a proximate cause of the collision. 
                        Three witnesses testified concerning the circumstances leading up to the collision:
McDonald, Dankworth, and Michael Mazza, the driver of the third vehicle involved in the collision. 
They did not dispute many of these circumstances. Shortly before 1:00 p.m. on Saturday, February
9, 2002, the three were in a line of northbound traffic on U.S. Highway 183 in Cedar Park. Mazza,
driving a minivan, was in front of McDonald, who was driving a 2002 Chevrolet Silverado pickup. 
Dankworth, then sixteen, was behind McDonald, driving a Plymouth Sundance. The three vehicles
were in the far-left northbound lane of an undivided portion of 183. The pavement was dry and
visibility was clear.
                        Initially, the line of vehicles was stopped at a red light at the intersection of 183 and
Cypress Creek.


 There was a considerable amount of traffic, and it was estimated that there were
as many as thirty other cars, or 400 feet, between Mazza’s car and the intersection.


 Mazza and
Dankworth testified that the light turned green,


 and all three witnesses agree that traffic began to
move, then stopped again, at which time Dankworth rear-ended McDonald.
                        Beyond these facts, Mazza and McDonald’s testimony differs somewhat from
Dankworth’s testimony regarding the events leading up to the collision. Mazza and McDonald gave
essentially the same account. In front of Mazza was a vehicle towing a boat. Traffic had begun to
move, then it began to stop again. The vehicle towing the boat stopped because the traffic ahead of
it had come to a stop, requiring Mazza, and then McDonald, to also stop. Both testified that Mazza
did not make an unsafe, sudden stop. Around the same time, the vehicle towing the boat began to
move left into the oncoming southbound lane of 183.
                        Then, as McDonald described it, “I heard screeching tires. I looked back. I saw her
vehicle coming and I got hit.” McDonald maintained that he did not hear screeching tires until after
he had already stopped. From Mazza’s perspective, “As I came to a stop I checked my rearview
mirror. I saw the truck behind me. I saw that it had come to a stop, shifted my focus back toward
the traffic in front of me. I heard an impact, looked to the rearview mirror and saw the truck coming
toward me again.” Mazza denied hearing screeching tires.
                        As Dankworth described the collision:

I was at a stop light on the intersection of Cypress Creek and 183 and I stopped. And
then traffic started going again, so I accelerated, I’m not sure how much. And then
all of the sudden I heard screeching of the brakes. I looked up and I saw brake lights
so I slammed on my brakes. And then I hit Mr. McDonald because I didn’t stop.


Dankworth added that while she had seen McDonald pushing on his brakes, she had not noticed him
pumping his brakes.
                        As suggested by her statement that she “looked up” before seeing McDonald’s brake
lights, Dankworth admitted that after the traffic signal turned green and she accelerated forward, she
had not been watching the back of McDonald’s truck, but instead was “looking around me seeing
what was going on . . . with the other vehicles” in other lanes. Dankworth added that she had looked
away for several seconds while accelerating forward and that, while doing so, she had no idea
whether anything was going on in front of her. However, Dankworth later qualified these assertions
by claiming that, even while looking away, she could still see McDonald’s truck “in the corner of
my eye.”
                        As previously noted, Dankworth acknowledged her own responsibility in causing the
accident


 and that “[b]esides making an unexpected stop, [McDonald] didn’t do anything wrong.”
She denied that McDonald had been driving erratically or otherwise acting unreasonably before the
accident, but was resolute that he bore partial responsibility for making an “unexpected” or “sudden”
stop in front of her. When specifically asked to explain what was “sudden” or “unexpected” about
McDonald’s stopping, Dankworth responded, “He just stopped unexpectedly. I didn’t—I wasn’t
prepared for him to stop like that.”
                        Dankworth also acknowledged that she could not see around McDonald’s truck
because her car was “really short compared to a truck,” and thus knew nothing about events
transpiring in front of McDonald. She denied knowing whether Mazza did anything unreasonable
to cause the accident or was able to stop without hitting persons in front of him, as “I’m not them.”
                        When asked to give her opinion as to why she hit McDonald, Dankworth suggested,
“Just someone, either him or someone in front of him made an unexpected stop and I didn’t have
enough time to react because I didn’t have the information that they had in front of them.” When
asked whether she was admitting responsibility for the accident, Dankworth responded, “I’m
admitting that yes, I am responsible, but he made an unexpected stop and I didn’t have any evidence
of what was going on in front of him.” When asked whether she was the cause of the accident,
Dankworth responded, “Like I said, if they would not have stopped unexpectedly, because I didn’t
have the information like they had.” 
                        McDonald contends that this evidence is legally and factually insufficient to support
the jury’s finding that his contributory negligence was a proximate cause of the collision. He urges
that, in effect, the evidence conclusively establishes that Dankworth was the sole proximate cause
of the collision: that “[a]t best, Dankworth was not paying attention to her driving and failed to keep
a proper lookout and control her speed.” See City of Keller, 168 S.W.3d at 814-17 (identifying
conclusive contrary evidence as one class of “no evidence” situations). McDonald also asserts that
there is no evidence that he was negligent—that “[n]o one testified that McDonald was doing
anything wrong or driving negligently.” See Carney, 837 S.W.2d at 210.


 While admitting that she
was negligent and that she helped cause the collision, Dankworth maintains that the following is
sufficient evidence that McDonald’s negligence also proximately caused the accident: (1) the
undisputed fact that McDonald stopped in front of Dankworth; (2) evidence that the traffic signal
was green at the time McDonald stopped; (3) Dankworth’s description of McDonald’s stopping as
sudden or unexpected; and (4) Dankworth’s testimony that she had not seen McDonald pump his
brakes, which she characterizes as a signal to stop. Dankworth cites a number of cases involving
rear-end collisions in which Texas courts have held that a lead driver’s sudden or abrupt stop without
warning on a roadway was, under the circumstances, sufficient evidence of negligence.



                        The evidence is inconsistent on whether McDonald stopped suddenly in front of
Dankworth. Both McDonald and Mazza testified that McDonald had been sitting stopped in traffic
behind Mazza in the moments before Dankworth hit him. The sole evidence that McDonald stopped
suddenly in front of Dankworth was her testimony. She testified that McDonald stopped
“unexpectedly” or “suddenly,” but did little to elaborate on what she meant. Dankworth did testify,
however, that she heard “screeching brakes,” then saw McDonald’s brake lights, but was unable to
avoid hitting him. The jury could have inferred from this testimony that the screeching brakes
Dankworth heard were McDonald’s and that McDonald, in fact, did stop suddenly or abruptly in
front of her. See Oakley v. C.E. Duke’s Wrecker Service, 557 S.W.2d 810, 812 (Tex. Civ.
App.—Houston [1st Dist.] 1977, writ ref’d n.r.e.); Rash v. Whisennand, 453 S.W.2d 353, 356-57
(Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref’d n.r.e.) (while a relative term, description of
stop as “sudden” sufficed as a shorthand rendition of the facts and party was not required to show
proof of skid marks or details regarding speed and following distance).


 And, viewing the evidence
in the light favorable to the verdict, we must assume that the jury resolved this conflicting evidence
in favor of concluding that McDonald stopped suddenly in front of Dankworth. “It is the province
of the jury to resolve conflicts in the evidence. Accordingly, courts reviewing all the evidence in a
light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that
verdict.” City of Keller, 168 S.W.3d at 819.
                        The evidence does not conclusively establish that Dankworth was negligently failing
to keep a lookout in front of her and that this failure was the sole proximate cause of the collision. 
Dankworth did admit that while accelerating forward, she had been “looking around . . . seeing what
was going on . . . with the other vehicles,” and had no idea whether anything was going on in front
of her, before she “heard screeching of the brakes . . . looked up and . . . saw brake lights.” Yet
Dankworth also testified that even while “looking around,” she could still see the back of
McDonald’s truck “in the corner of my eye.” Absent conclusive evidence that Dankworth could not
see the back of McDonald’s truck in this manner, it was within the jury’s province to credit
Dankworth’s testimony that she could. Id. at 812, 819-20. And a reasonable jury could have
resolved any inconsistency between this statement and her other testimony in favor of concluding
that Dankworth could see McDonald’s truck. Id. at 820-21. Under our standard of review, we must
assume the jury did. Id. at 820-21.
                        In light of these conclusions, McDonald’s legal sufficiency challenge to the jury’s
contributory negligence finding turns on whether evidence that he stopped suddenly is sufficient
proof that he was negligent. Dankworth contends that mere evidence that McDonald stopped
suddenly in front of her is sufficient to raise an issue of his negligence. McDonald points out that
numerous Texas decisions hold that a motorist compelled to stop by traffic signals or traffic
conditions may owe no duty to motorists approaching from the rear to keep a rear lookout or
avoiding stopping suddenly.


 He argues that the evidence is insufficient to support any inference
that circumstances existed under which he had a duty not to stop suddenly, and, at most, is equally
consistent with his having a duty not to stop suddenly as it is with his not having such a duty. See
City of Keller, 168 S.W.3d at 813-14 (discussing equal inference rule). We need not consider
whether evidence that McDonald stopped suddenly is alone sufficient to raise an issue regarding his
negligence because other evidence is sufficient to present an issue whether McDonald had a duty
under the circumstances not to stop suddenly.
                        In assessing the evidence bearing upon that determination, we consider not only
Dankworth’s description of the collision, but also the events in front of McDonald’s truck that
Dankworth admitted she could not see. Id. at 811-12 (discussing contextual evidence). Viewed in
the light most favorable to the jury’s finding, this evidence raises an issue as to whether McDonald
was negligent in stopping suddenly under the circumstances. Specifically, both McDonald and
Mazza testified that Mazza did not stop suddenly or unsafely, but made what McDonald termed a
“normal stop.” The jury could have credited this testimony, and doing so would have made more
probable than not that either: (1) McDonald stopped more suddenly and abruptly than was necessary
to avoid hitting Mazza, cf. Rash, 453 S.W.2d at 358-59 (finding fact issue regarding negligence
where there was evidence that lead driver slammed on brakes one and one-half car lengths behind
the next car in front); or (2) McDonald’s sudden stop was made necessary by his negligence in
following too closely behind Mazza. Cf. Oakley, 557 S.W.2d at 813 (evidence that lead driver had
negligently created situation that required her to make sudden stop). We hold that the evidence was
legally sufficient to support the jury’s finding that McDonald was negligent and his negligence was
a proximate cause of his collision with Dankworth.
                        We now turn to McDonald’s factual sufficiency challenge to the jury’s finding that
his negligence was a proximate cause of the collision. The evidence supporting the jury’s
contributory negligence finding includes: 
 
●     Dankworth’s testimony that McDonald stopped suddenly. 
 
●     Dankworth’s testimony that she could see the back of McDonald’s truck in the
“corner of her eye,” and thus would have been able to view the manner in which
McDonald stopped.
 
●     Dankworth’s testimony that she heard “screeching brakes” immediately before
the collision, which the jury reasonably could have inferred were McDonald’s
brakes, and which is further evidence that McDonald stopped suddenly. 
 
●     McDonald and Mazza’s testimony that Mazza stopped “normally,” from which
the jury could have inferred that McDonald either acted negligently in stopping
suddenly or negligently created the conditions necessitating that he stop
suddenly.
 
                        The evidence supporting McDonald’s account of the collision includes: 

 
●     McDonald and Mazza’s testimony that both were sitting stopped in traffic before
Dankworth hit McDonald.
 
●     Dankworth’s admission that she had been “looking around” while accelerating
forward and had no idea what was occurring in front of her.
 
●     McDonald’s testimony that he heard squealing tires only after he was sitting
stopped, when he noticed Dankworth approaching and hitting him. From this,
the jury might have inferred that Dankworth slammed on her brakes and created
any “squealing brakes” noise she testified she heard. 
 
●     Dankworth’s testimony that she was “looking around,” then heard “squealing
brakes,” “looked up,” and noticed McDonald’s stopped truck. This account is
consistent with her not keeping a proper lookout. 
 
●     The inconsistency between this testimony and Dankworth’s later qualification
that she could still see the back of McDonald’s truck in the “corner of my eye,”
from which the jury might have inferred that Dankworth was not credible. 
 
●     Dankworth’s inability to articulate precisely what was “sudden” or “unexpected”
about McDonald’s stopping, which the jury might have inferred was consistent
with her not having kept a proper lookout as she accelerated forward.
 
 
                        The jury’s contributory negligence finding ultimately rests upon the credibility of
Dankworth’s testimony that she could see McDonald’s truck while she accelerated forward and he
stopped suddenly. We will not second-guess this credibility assessment in the guise of our factual
sufficiency review. See Jackson, 116 S.W.3d at 761. In light of this testimony, we cannot say that
the evidence is so one-sided that the jury’s contributory negligence finding is clearly wrong or
manifestly unjust. We hold that the evidence was both legally and factually sufficient to support the
jury’s finding that McDonald’s contributory negligence was a proximate cause of the collision. We
overrule McDonald’s first issue. Our disposition of this issue is also decisive of McDonald’s second
issue, in which he contends that the evidence is legally and factually insufficient to support any
finding in Question 2 other than that Dankworth was 100% responsible for the collision. We
overrule McDonald’s first and second issues.

Damages
                        In his third issue, McDonald argues that the evidence conclusively establishes that
he incurred $31,348.87 in past medical expenses; alternatively, he argues that the jury’s award of
only $4,597.57 is against the great weight and preponderance of the evidence. In his fourth and fifth
issues, McDonald argues that the jury’s award of zero damages for physical impairment, pain and
mental anguish is against the great weight and preponderance of the evidence.


 
                        The trial court submitted damages in Question 3 of the charge. It inquired, “What
sum of money, if paid now in cash, would fairly and reasonably compensate David McDonald for
his injuries, if any, that resulted from the occurrence in question?” The jury was asked to answer
separately regarding the following elements of damages: (1) medical care in the past; (2) physical
pain and mental anguish sustained in the past; (3) loss of earnings in the past; and (4) physical
impairment sustained in the past. The charge did not define any of these damage elements, but did
instruct the jury to consider each element separately and not to include damages for one element in
any other element. The jury awarded $4,597.57 for past medical care, $1,497.54 for past loss of
earnings, and zero damages for both past physical impairment and physical pain and mental anguish. 
                        McDonald introduced evidence that on the evening following the collision, he began
feeling stiff and sore in his neck and upper back. He described the sensation at the time as “[n]ot
a sharp pain, just soreness and stiffness and . . . a mild headache. And it seemed like I had felt some
swelling in the back of my head.” McDonald added that “I wasn’t having a lot of pain but my
movement was restricted.” McDonald had planned to report to his work that evening as an Austin
police officer; he began to drive to work but ultimately turned around and returned home.
                        McDonald went to the Seton Northwest emergency room on the following morning,
and explained that he had been in an automobile accident. The staff on duty did not perform x-rays
or tests, but prescribed a pain killer and muscle relaxer. On Monday morning, McDonald went to
see his primary care physician, Dr. Allen Mauldin, who prescribed an anti-inflammatory drug and
ordered x-rays on McDonald’s cervical spine. The x-ray results were normal and indicated that
McDonald had suffered no fractures. Dr. Mauldin also told McDonald not to return to work until
February 14, and to confine himself to light duty for a week once he returned to work.
                        On the day after McDonald’s visit with Dr. Maudlin, McDonald also began seeing
a chiropractor whom he had found in the phone book “[b]ecause I was having problems with my
upper back, shoulders and neck area . . . [s]tiffness and soreness and stiffness and—soreness.” He
saw the chiropractor three times a week until early March.
                        Over the next two weeks, McDonald testified that he began experiencing intermittent
severe headaches in the back of his head and upper part of his neck area. He testified that he had
never experienced headaches like that previously. McDonald testified that at times the pain
medication and muscle relaxants he had been prescribed did not alleviate his pain, so on occasion
he would drink alcohol to intensify the effects of the drugs and relieve the pain. He explained that
“the pain was so severe that that’s all I could do at the time.” 
                        On February 27, McDonald returned to Dr. Mauldin’s office, complaining of severe
headaches. Dr. Mauldin ordered an MRI to try to determine the cause of the headaches. The MRI
revealed a cyst in McDonald’s sinus cavity, and he was told to seek medical treatment from an ear,
nose, and throat specialist (ENT). McDonald contacted the office of ENT specialists where his
daughter had her tonsils removed and scheduled an appointment with the first available doctor, Dr.
Steven Fyfe.
                        McDonald informed Dr. Fyfe that he had been referred because his MRI had revealed
a cyst in his sinus cavity. Fyfe ruled out a cyst but, during his examination of McDonald, ascertained
that McDonald had been in an automobile accident and had been experiencing pain in the back of
his head and neck. McDonald testified that Fyfe explained that a cervical x-ray would not pick up
fractures in vertebrae higher up the neck, so Fyfe ordered a CAT scan; McDonald added that this
procedure was in response to his neck and head pain, not the headaches he had been experiencing. 
After the CAT scan was completed, McDonald appeared flush, was suffering from a severe
headache, and was experiencing a tingling sensation in his jaw.
                        These symptoms concerned Dr. Fyfe, who believed they might indicate that
McDonald’s carotid artery had been torn in the car accident. A previous patient had suffered from
the same condition after experiencing whiplash in a boating accident, and ended up having several
strokes. Dr. Fyfe was so concerned that he advised McDonald to go to the emergency room
immediately. In Dr. Fyfe’s words, a torn artery would have been a “ticking time bomb.” Fyfe
ordered McDonald to the Seton emergency room, which was across the street from Fyfe’s office. 
Once at the hospital, initial testing appeared to confirm Dr. Fyfe’s suspicions. McDonald stayed at
the hospital overnight and the next morning an arteriogram was performed. It revealed that, in fact,
McDonald did not have a torn carotid artery.
                        During the evening before his arteriogram, a neurologist, Dr. Leonard, gave
McDonald two steroid shots in the back of his head. Dr. Leonard administered similar treatments
during subsequent visits; McDonald testified that “they were painful to get but they helped with the
headaches.” McDonald recounted that he started feeling better by April.
                        McDonald sought a total of $31,348.87 in past medical expenses, including (1)
expenses from his initial emergency room visit; (2) the cost of the prescription medications he
received after his initial emergency room visit; (3) expenses from his February 12 and 27 visits to
Dr. Mauldin; (4) costs of the x-rays ordered by Dr. Maudlin; (5) expenses from McDonald’s
chiropractic treatments; (6) expenses from the MRI ordered by Dr. Mauldin; (7) expenses from
McDonald’s visits to Dr. Leonard; and (8) expenses associated with McDonald’s visits to Dr. Fyfe
and subsequent testing to rule out a torn carotid artery.
                        Dankworth vigorously disputed the reasonableness and necessity of the procedures
ordered by Dr. Fyfe. Dr. Paul Roach, a cardiologist, testified that the symptoms Dr. Fyfe observed
in McDonald—headache, flushing of the face, and light-headedness—were “nonspecific” in nature
and not necessarily symptoms of a carotid artery dissection. He also testified that a carotid artery
dissection is “exceedingly rare,” affecting “two or three [people] per hundred thousand or million.” 
Dr. Fyfe’s credibility was also challenged. Dankworth’s counsel questioned Dr. Fyfe’s ability, as
an ear, nose, and throat specialist, to accurately diagnose a carotid artery dissection. He also
questioned the thoroughness of Dr. Fyfe’s evaluation of McDonald, specifically eliciting testimony
that Dr. Fyfe did not have the records of McDonald’s primary care provider in front of him while he
was evaluating McDonald, and that Dr. Fyfe did not ask important questions about McDonald’s
history prior to making his diagnosis. Dr. Fyfe also admitted that he “didn’t know exactly what was
going on” with McDonald, and that is why he sent him to the emergency room. Dr. Fyfe testified
that the carotid artery dissection was “just something on the list of what it might be.”
                        It is undisputed that Dr. Fyfe, an ear, nose, and throat specialist, was selected by
McDonald to treat a retention cyst in his sinus, and that this cyst was unrelated to the car accident.
Dankworth also presented evidence from which the jury could have inferred that any injuries and
damages that McDonald incurred were attributable to factors other than the collision. Dankworth
adduced evidence that, prior to the collision, McDonald had experienced pain and discomfort in his
head. McDonald admitted that he had suffered sinus problems since approximately 1997, and had
periodically seen Dr. Mauldin for treatment of dizziness, which Dr. Mauldin concluded was likely
a vasovagal reaction to low blood sugar or a viral infection. During the year prior to the collision,
McDonald sought treatment from Dr. Mauldin for feeling light-headed and sweating. During the
month prior to the collision, and as recently as ten days before it, McDonald had been seeing Dr.
Maudlin for “pressure in the front of my head and some sinus and possibly allergy problems.” 
                        Dankworth also elicited evidence that McDonald had disregarded doctor’s orders
regarding his workload after the collision, that he had delayed seeking medical treatment, and that
he wore a heavy motorcycle helmet on his job. Finally, Dankworth emphasized that McDonald had
not complained of pain at the accident scene, that his x-rays were normal, and that his claimed
injuries had caused relatively little interruption to his work schedule.
                        A rational jury could infer from the evidence that the expenses associated with Dr.
Fyfe and his suspicion of a carotid artery dissection did not result from the collision, but from the
discovery of the retention cyst, a condition unrelated to the collision. A rational jury could further
infer that McDonald’s own actions caused or contributed to his symptoms. 
                        The evidence, therefore, fails to conclusively establish that McDonald incurred the
full $31,348.87 in medical expenses that he sought. Nor is the jury’s award of $4,579.57 against the
great weight and preponderance of the evidence. This amount slightly exceeds the total amount of
medical expenses that McDonald sought that were not attributable to Dr. Fyfe. The evidence was
factually sufficient to enable the jury to award this amount. We overrule McDonald’s third issue. 
                        For similar reasons, the jury’s awards of zero damages for physical impairment and
physical pain and mental anguish is not against the great weight and preponderance of the evidence. 
McDonald attempts to invoke the principle that a jury award of no damages for physical pain or
impairment must be set aside where there is objective, undisputed evidence of a significant injury. 
See Jackson, 116 S.W.3d at 775. He contends that there is undisputed evidence of such an injury
here: the medical records of neurologist Dr. Leonard, which diagnose McDonald with occipital
neuralgia, a chronic pain disorder caused by an injury to the occipital nerve in the back of the scalp.
Assuming this condition suffices as objective proof of injury, the jury reasonably could have
attributed it to factors other than the collision. We note that Dr. Leonard did not see McDonald until
roughly three weeks after the collision. The jury could have concluded that, among other things,
McDonald incurred only minor injuries in the collision not rising to the level of compensable pain
or impairment, and that intervening events unrelated to the collision were the true cause of the
condition diagnosed by Dr. Leonard. See Rios v. Dep’t of Mental Health & Mental Retardation, 58
S.W.3d 167, 171 (Tex. App.—San Antonio 2001, no pet.); see also McGuffin v. Terrell, 732 S.W.2d
425, 427-28 (Tex. App.—Fort Worth 1987, no writ) (holding that jury may award no damages for
pain and suffering despite finding other damages resulting from injury, if damages found are minimal
and complaint of injury is subjective). We overrule McDonald’s fourth and fifth issues.

CONCLUSION
                        Having overruled each of McDonald’s issues on appeal, we affirm the judgment of
the district court.
 
 
                                                                                                                                                            
                                                                        Bob Pemberton, Justice
Before Justices B. A. Smith, Puryear and Pemberton
Affirmed
Filed: May 5, 2006